Appeal No. 2014-1422

# United States Court of Appeals

*for the*

# Federal Circuit

ENDO PHARMACEUTICALS INC.,

*Plaintiff-Appellant,*

– v. –

MYLAN PHARMACEUTICALS INC. and MYLAN INC.,

*Defendants-Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE IN CASE NO. 11-CV-00717,
JUDGE RENEE MARIE BUMB

## APPELLANT ENDO PHARMACEUTICAL INC.'S
## NON-CONFIDENTIAL OPENING BRIEF

JEFFREY I.D. LEWIS (Counsel of Record)
JASON R. VITULLO
HELEN P. O'REILLY
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000
jidlewis@pbwt.com

*Counsel for Plaintiff-Appellant Endo
Pharmaceuticals Inc.*

June 20, 2014

# CERTIFICATE OF INTEREST

Counsel for the Appellant Endo Pharmaceuticals Inc. certifies the following:

1. The full name of every party or amicus represented by me:

   Endo Pharmaceuticals Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   Endo Pharmaceuticals Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   Endo Pharmaceuticals Inc. is wholly-owned by Endo International PLC.

4. The name of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   Jeffrey I.D. Lewis, Edward R. Tempesta, Jason Vitullo, Richard Maidman, Helen P. O'Reilly, Sean Marshall, Poopak Banky, and Melissa Mandrgoc of Patterson Belknap Webb & Tyler LLP, New York, NY; Jack Blumenfeld, Julia Heaney, and Jeremy Tigan of Morris Nichols Arsht & Tunnell LLP, Wilmington, DE.


June 20, 2014                          /s/ Jeffrey I.D. Lewis
                                       Jeffrey I.D. Lewis (jidlewis@pbwt.com)
                                       Patterson Belknap Webb & Tyler LLP
                                       1133 Avenue of the Americas
                                       New York, NY 10036
                                       Telephone Number: (212) 336-2000
                                       Fax Number: (212) 336-2222

i

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ..................................................................i

STATEMENT OF RELATED CASES ....................................................ix

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF ISSUES .......................................................................2

STATEMENT OF THE CASE ..................................................................3

A. A Settlement Did Not Occur, Since The Parties Did Not Agree on all Materials Terms or Manifest An Intent to be Bound ..................6

    1. The District Court Ignored An Open "Threshold" Issue.................................................................................7

    2. The District Court Ignored Other Open Terms...........................9

    3. The District Court Improperly Applied a One-Way Test, Allowing Mylan to Declare Settlement Even Though Endo Never Could Have...............................................10

    4. The Chilling Effect of the District Court's Decision ..................................................................................11

B. The District Court's Improper "Judicial Estoppel" Order ..................12

STATEMENT OF FACTS ......................................................................14

A. Parties and Products ......................................................................14

B. The Patent Litigation .....................................................................16

C. The District Court's Judicial Estoppel Ruling ....................................17

D. Post-Trial Settlement Discussions and Mylan's Motion To Enforce a Settlement .........................................................................21

E. The District Court's April 8, 2014 Order............................................32

STANDARD OF REVIEW .....................................................................32

ARGUMENT ..........................................................................................35

I. THE PARTIES DID NOT REACH AN ENFORCEABLE AGREEMENT WHERE TERMS WERE EXPRESSLY UNRESOLVED.......................................................................................35

A. District Court Failed to Apply Appropriate Standard and Burden of Proof for Judicial Enforcement of a Contested Settlement Agreement ...........................................................................36

B. The Parties Never Reached an Enforceable Settlement Agreement As A Matter of Law..........................................................37

**TABLE OF CONTENTS**
**(continued)**

Page

1. Parties Did Not Agree on All Material Terms ...........................38

    a. ████████████████ Remained a Material Term and Was Never Resolved by the Parties ..........................................................................39

    b. Discussion of Other Outstanding Terms and Further Negotiations Precludes Finding an Enforceable Settlement ....................................42

2. Endo's Explicit Reservation That There Were "Significant Issues to be Resolved Before any Settlement Could be Completed" Precludes Finding an Objection Manifestation of Assent .........................44

3. The Parties Failed Even to Agree on a Sufficiently Definite Term for Mylan's Launch Date ...................................46

4. The Parties Contemplated that a Complete Writing Was Necessary in Order to Create Final Enforceable Agreement. ............................................49

  C. The District Court's Ruling Is Untenable Since Complex Negotiations Require Tentative "Agreements Made Along the Way" ........................................................................................51

II. THE COURT BELOW IMPROPERLY APPLIED JUDICIAL ESTOPPEL IN ORDER TO PRECLUDE ENDO FROM PURSUING CLAIMS AGAINST MYLAN BASED ON THE '611 AND '871 PATENTS....................................................................53

  A. The Court Misapplied the Doctrine of Judicial Estoppel ....................53

  B. The District Court's Finding that Endo "Abandoned" Its Rights In the '611 and '871 patents is Clearly Erroneous .............................56

CONCLUSION ....................................................................................59

CONFIDENTIAL MATERIAL OMITTED

The material redacted from this brief and addendum comprises materials filed under seal with the district court, as well disclosures regarding settlement negotiations which were redacted from the public record by order of the district court dated June 2, 2014 (Dkt. No. 325).

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*3M v. Chemque, Inc.*,
  303 F.3d 1294 (Fed. Cir. 2002) ..........................................................34

*AT&T Corp. v. Mosaica Educ., Inc.*,
  No. 03-1012 GMS, 2008 U.S. Dist. LEXIS 52594 (D. Del. July 10, 2008) ......33

*Bank of Am. Nat'l Trust & Sav. Ass'n v. Hotel Rittenhouse Assocs.*,
   800 F.2d 339 (3d Cir. 1986) ...........................................................52

*Behrend v. Comcast Corp.*,
  No. 03-6604, 2012 U.S. Dist. LEXIS 137451 (E.D. Pa. Sept. 25, 2012)...........38

*Borne v. A & P Bd. Rentals No. 4, Inc.*,
  780 F.2d 1254 (5th Cir. 1986) .........................................................33

*California Sun Tanning USA, Inc. v. Elec. Beach, Inc.*,
  No. 08-4843, 369 Fed. Appx. 340 (3d Cir. 2010) ..............................34

*Chung v. Choi*,
  No. 07-2187, 2008 U.S. Dist. LEXIS 63180 (E.D. Pa. Aug. 18, 2008),
  aff'd, 2009 U.S. App. LEXIS 12445 (3d Cir. June 4, 2009).............................38

*Ciaramella v. Reader's Digest Assn., Inc.*,
  131 F.3d 320 (2d Cir. 1997) ...........................................................50

*Erie Telecomms., Inc. v. City of Erie*,
  853 F.2d 1084 (3d Cir. 1988) .........................................................33

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
  535 U.S. 722 (2002).......................................................................57

*Gilead Sciences v. Natco Pharma Ltd.*,
  No. 2013-1418, 2014 U.S. App. LEXIS 7494, 110 U.S.P.Q. 2d 1551
  (Fed. Cir. Apr. 22, 2014) ...............................................................13

*Intellisource Grp., Inc. v. Williams*,
  No. 98-57-SLR, 1999 U.S. Dist. LEXIS 12446 (D. Del. Aug. 11, 1999)...passim

*Int'l Telemeter Corp. v. Teleprompter Corp.*,
  592 F.2d 49 (2d Cir. 1979) ...........................................................52

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Lannett Co. v. Celgene Corp.*,
No. 08-3920, 2011 U.S. Dist. LEXIS 32915 (E.D. Pa. Mar. 29, 2011) .......36, 42

*Leeds v. First Allied Conn. Corp.*,
521 A.2d 1095 (Del. Ch. 1986) ........................................................................51

*Maya Swimwear Corp. v. Maya Swimwear L.L.C.*,
855 F. Supp. 2d 229 (D. Del. 2012).........................................................5, 33, 44

*Mazzella v. Koken*,
559 Pa. 216 (Sup. Ct. Pa. 1999)...................................................................37, 38

*McClure v. Township of Exeter*,
No. 05-5846, 2006 U.S. Dist. LEXIS 69414 (E.D. Pa. Sept. 27, 2006)...............6

*Medpointe Healthcare, Inc. v. Kozachuk*,
373 Fed. Appx. 62 (Fed. Cir. 2010)....................................................................5

*Metro. Life Ins. Co. v. Hayes-Green*,
No. 07-CV-2492 (WJM), 2008 U.S. Dist. LEXIS 110220 (D.N.J. May
20, 2008) .............................................................................................................5

*Montrose Med. Grp. Participating Sav. Plan v. Bulger*,
243 F.3d 773 (3d Cir. 2001) ..........................................................34, 53, 54, 55

*Morales v. Sun Constructors, Inc.*,
541 F.3d 218 (3d Cir. 2008) ..............................................................................44

*Mosaid Techs., Inc. v. LSI Corp.*,
878 F. Supp. 2d 503 (D. Del. 2012)...................................................................52

*Novamedix, Ltd. v. NDM Acquisition Corp.*,
166 F.3d 1177, 1180 (Fed. Cir. 1999) ..............................................................32

*Orta v. Con-Way Transp.*,
No. 02-1673, 2002 U.S. Dist. LEXIS 19302 (E.D. Pa. Oct. 8, 2002).................6

*Perricone v. Medicis Pharm. Corp.*,
432 F.3d 1368 (Fed. Cir. 2005) ............................................................. 13, 54-55

**TABLE OF AUTHORITIES**
**(continued)**

                                                                    **Page(s)**

*Quandry Solutions Inc. v. Verifone Inc.*,
    No. 07-097, 2009 U.S. Dist. LEXIS 31459 (E.D. Pa. Apr. 13, 2009) ...37, 42, 49

*Regents of the Univ. of New Mexico v. Knight*,
    321 F.3d 1111 (Fed. Cir. 2003) ..........................................................................32

*Rohm and Haas Elec. Materials, LLC v. Honeywell Int'l, Inc.*, No. 06-297,
    2009 U.S. Dist. LEXIS 32201 (D. Del. April 16, 2009) .............................. 44-45

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
    81 F.3d 355 (3d Cir. 1996) ......................................................................... 53-54

*Sanofi-Aventis v. Apotex Inc.*,
    659 F.3d 1171 (Fed. Cir. 2011) .......................................................................32

*Standard Steel LLC v. Buckeye Energy, Inc.*,
    No. 04-538, 2005 U.S. Dist. LEXIS 22378 (W.D. Pa. Sept. 29, 2005) ...............6

*Tedesco Mfg. Co. v. Honeywell Int'l, Inc.*,
    127 Fed. Appx. 50 (3d Cir. 2005)........................................................................5

*Thorner v. Sony Computer Entm't Am., LLC*,
    No. 09-1894 (MLC), 2013 U.S. Dist. LEXIS 36775 (D.N.J. Mar. 18,
    2013) ....................................................................................................................5

*Tiernan v. Devoe*,
    923 F.2d 1024 (3d Cir. 1991) ...................................................................33, 34

*Transp. Int'l Pool, Inc. v. Alt. Transp., Inc.*,
    No. 07-2895, 2008 U.S. Dist. LEXIS 48756 (E.D. Pa. June 25, 2008) ...............5

*United States v. Abbott*,
    584 F. Supp. 442 (W.D. Pa. 1984).....................................................................57

*United States v. Cowan*,
    396 F.2d 83 (2d Cir. 1968) ................................................................................57

*United States v. Gypsum Co.*,
    333 U.S. 364 (1948)...........................................................................................35

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*United States v. Moody,*
    485 F.2d 531 (3d Cir. 1973) ...............................................................57

*United States v. Pelullo,*
    399 F.3d 197 (3d Cir. 2005) ..............................................................55

*Wyndmoor Learning Ctr. v. City of Wilmington,*
    No. 93-4217, 1996 U.S. Dist. LEXIS 3103 (E.D. Pa. Mar. 12, 1996) ................6

**STATUTES AND REGULATIONS**

28 U.S.C. § 292(b) ...............................................................................16

28 U.S.C. § 1295(a)(1)...........................................................................1

28 U.S.C. §§ 1331 ................................................................................1

28 U.S.C. §§ 1338(a).  ..........................................................................1

35 U.S.C. § 156.............................................................................12, 16

35 U.S.C. § 271(e)(2)............................................................................3

Fed. R. Civ. P. 41(a)............................................................................57

Fed. R. Civ. P. 41(b) ...........................................................................58

Fed. R. Civ. P. 52(a)(6).........................................................................35

Fed.  R. Civ. P. 56(c)...........................................................................33

**OTHER AUTHORITIES**

1 Am. Jur. 2d, *Abandoned, Lost, and Unclaimed Property*, § 3 (2005).................57

1 Am. Jur. 2d, *Abandoned, Lost, and Unclaimed Property*, § 9 (2005).................57

1 Am. Jur. 2d, *Abandoned, Lost, and Unclaimed Property*, § 55 (2005)...............57

1 Am. Jur. 2d, *Abandoned, Lost, and Unclaimed Property*, § 58 (2005)...............56

Manual of Patent Examining Procedure (MPEP) §804.02(IV) ...............................17

vii

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Medicare Modernization Act §§ 1112-13,
    Pub. L. 108-173, 117 Stat. 2461-63 (2003) ........................................................31

Restatement (Second) of Contracts § 17 cmt. c (1981) ..........................................44

Restatement (Second) of Contracts § 20 (1981) .....................................................49

Restatement (Second) of Contracts § 27 cmt. b. (1981) .........................................50

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Plaintiff-Appellant Endo

Pharmaceuticals Inc. ("Endo") provides as follows:

(a) The following appeals were taken from the district court's initial

merits judgment in the underlying matter:

a. No. 14-1324

b. No. 14-1365

The merits judgment was subsequently vacated rendering the

initial appeals moot, which is in part the subject of the present

appeal, and this Court dismissed the initial merits appeals by

mandate dated May 30, 2014.

(b) There are no related cases pending in this Court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over the underlying patent infringement litigation pursuant to 28 U.S.C. §§ 1331 and 1338(a). This Court has appellate jurisdiction under 28 U.S.C. § 1295(a)(1).

This appeal is taken from (i) the Sealed Order of judgment and accompanying Opinion dated April 8, 2014 (A1-A39, A40-41; Opinion as redacted at A3471-3509), which granted Defendants' motion to enforce a purported oral settlement of the matter just minutes prior to the district court holding that Mylan Pharmaceuticals Inc. and Mylan Inc. (collectively, "Mylan") infringed valid claims of U.S. Patent No. 5,464,864; and (ii) the district court's Order during trial (A1638-47, A1680-1710) that Endo Pharmaceuticals Inc. ("Endo") abandoned its infringement claims against Mylan based upon U.S. Patents Nos. 5,637,611 and 5,827,871 by filing a terminal disclaimer and therefore Endo is judicially estopped from pursuing those claims.

Endo timely filed its Notice of Appeal on April 16, 2014. Mylan filed a motion to dismiss this appeal, particularly as to the judicial estoppel holding (A3151-62), which this Court denied on May 30, 2014 (Docket No. 14).

## STATEMENT OF ISSUES

1.      Did the trial court err in ruling that the parties entered into an enforceable settlement agreement during a brief phone call between in-house counsel, thereby depriving Endo of the full rights to its patented invention and requiring Endo to pay Mylan (the defendant) money, despite the undisputed fact that the parties acknowledged during that call that "significant" issues remained open?

2.      Did the trial court err in holding that the parties entered into a settlement based upon a determination that Mylan subjectively abandoned a settlement term that Mylan itself had initially proposed as an essential term, when the objective undisputed evidence is that (a) the term was discussed during the last settlement conversation between counsel but not resolved, (b) Mylan's counsel did not indicate an intention to abandon that term, and (c) no agreement was reached on the term but instead Mylan's counsel indicated that Endo should "mark [] up" an initial proposal that Mylan had sent two business days earlier?

3.      Did the trial court err in holding during trial that Endo had abandoned and therefore was judicially estopped from pursuing its claims against Mylan related to U.S. Patents Nos. 5,637,611 and 5,827,871?

## STATEMENT OF THE CASE

This is a patent infringement action, filed by Endo against Mylan for infringement under the Hatch Waxman Act (codified at 35 U.S.C. § 271(e)(2)) of three patents, U.S. Patents Nos. 5,464,864, 5,637,611, and 5,827,871 (respectively, the '864, '611 and '871 patent). The patents generally cover frovatriptan, the active pharmaceutical ingredient in Endo's FROVA migraine product. FROVA has been a boon to migraine sufferers.

Mylan filed an Abbreviated New Drug Application seeking approval from the U.S. Food & Drug Administration ("FDA") to market a generic version of FROVA prior to patent expiration. Endo timely sued. After a bench trial, where Mylan had conceded infringement, the district court held on January 28, 2014 that *inter alia* Mylan's product infringed the asserted valid claims of the '864 patent (the "Merits Decision") (A1948-2055, A2056-57). In other words, after Mylan conceded infringement and reserved its challenges to the validity of the patents, the district court found that Endo was entitled to the full measure of its patent rights – to utilize the patented invention until expiration.

Within hours of the Merits Decision being filed, Mylan advised the district court that the parties had already settled, which Endo disputed. After briefing and a subsequent hearing, the district court ruled the parties entered into an enforceable oral settlement that during an approximately 90-second phone call

3

*CONFIDENTIAL MATERIAL REDACTED*

the morning of January 28, minutes before the Merits Decision issued. The

uncontested evidence shows otherwise.

During that call, in-house counsel for Endo explicitly told in-house

counsel for Mylan that "there were ***significant issues to be resolved*** before any

settlement could be completed." (A2676, 2767 (emphasis added).) In part, these

"significant issues" stemmed from a number of new terms proposed by Mylan in

an initial draft settlement agreement that Mylan had sent on January 24, 2014 – and

also because the draft had for the first time included details concerning an issue

under discussion: ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████. In response to Endo saying

there were still "significant issues," Mylan did **not** tell Endo it had abandoned any

of the terms **but instead** responded only that Endo should "mark [] up" the draft

(A2674, 2695-96, 2703).

Notwithstanding Endo's explicit reservations, the district court held

that the parties reached an enforceable settlement. The court concluded that the

unresolved terms were "not unimportant" to Endo (A37) and also agreed that Endo

explicitly said they were "significant" (A37 n.29). Yet, these "significant" and

"important" unresolved terms were nevertheless not "essential" (A37-38), and the

4

court held that Endo exhibited "clear intent" to be bound by all "essential" terms.

(*Id.*) But this finding is clearly erroneous. Endo told Mylan during the call that the outstanding items were "significant" and needed to be resolved "before any settlement could be completed" (A2676, 2767). This is the very definition of "essential" terms, and Endo unambiguously communicated to Mylan that it did *not* intend to be bound by an agreement during the January 28 call.

Typically, decisions enforcing a settlement are premised on writings showing an agreement between the parties (*e.g.*, emails, term sheets, partially executed drafts)[1] or on some other objective indicia (*e.g.*, a court transcript or confirmation by a magistrate or mediator)[2]. Not so in this case; the only objective

---

[1] *See, e.g.*, *Thorner v. Sony Computer Entm't Am., LLC*, No. 09-1894 (MLC), 2013 U.S. Dist. LEXIS 36775, at *11-12, *17-18, *22 (D.N.J. Mar. 18, 2013) (defendant accepted plaintiff's written draft reflecting all negotiated terms, "subject to minor revisions" and thereafter plaintiff's counsel took the position that "both parties had reached an agreement"); *Transp. Int'l Pool, Inc. v. Alt. Transp., Inc.*, No. 07-2895, 2008 U.S. Dist. LEXIS 48756, at *3-5, *15 (E.D. Pa. June 25, 2008) (plaintiff's counsel sent document with "Essential Terms of Settlement," and defendant's counsel advised court that "Plaintiff and Defendant in the above captioned case have reached settlement terms and are currently in the process of documenting those terms"); *Maya Swimwear Corp. v. Maya Swimwear L.L.C.*, 855 F. Supp. 2d 229, 232-33, 235 (D. Del. 2012) (plaintiffs' counsel sent e-mail to defense counsel stating that clients had given "green light" to settlement, and defense counsel threatened action if plaintiff reneged).

[2] *See Medpointe Healthcare, Inc. v. Kozachuk*, 373 Fed. Appx. 62, 63-65 (Fed. Cir. 2010) (parties assented to terms on record at settlement conference); *Tedesco Mfg. Co. v. Honeywell Int'l, Inc.*, 127 Fed. Appx. 50, 51-52 (3d Cir. 2005) (settlement terms dictated to court reporter); *Metro. Life Ins. Co. v. Hayes-Green*, No. 07-CV-2492 (WJM), 2008 U.S. Dist. LEXIS 110220, at *1-2, 4 (D.N.J. May 20, 2008)

evidence is the January 24 draft that Mylan sent to Endo – which Endo never responded to other than saying (as the parties agree) that Endo did not agree to it because there "were **significant issues** to be resolved" (A2676, 2767 (emphasis added)).

### A. A Settlement Did Not Occur, Since The Parties Did Not Agree on all Materials Terms or Manifest An Intent to be Bound

The law is clear that <u>*objective*</u> mutual assent is necessary to create an enforceable agreement, and, likewise, an enforceable settlement. That did not occur here.

The district court's ruling concerning the January 28 call turns the law of contracts on its head, disregarding the open issues and the accompanying uncontested, explicit reservation that "significant issues" remained to be resolved. The lower court found mutual assent and enforceability based on an overly simplistic framing of "offer" and "acceptance" in the context of a complex business negotiation, and improperly relied on the testimony of Mylan's unstated

---

(settlement placed on court record); *McClure v. Township of Exeter*, No. 05-5846, 2006 U.S. Dist. LEXIS 69414, at *2, 4 (E.D. Pa. Sept. 27, 2006) (party told judge at settlement conference that she accepted terms of agreement); *Standard Steel LLC v. Buckeye Energy, Inc.*, No. 04-538, 2005 U.S. Dist. LEXIS 22378, at *25-26 (W.D. Pa. Sept. 29, 2005) (agreement reached at settlement mediation); *Orta v. Con-Way Transp.*, No. 02-1673, 2002 U.S. Dist. LEXIS 19302, at *1-2, 5-6 (E.D. Pa. Oct. 8, 2002) (settlement confirmed at mediation); *Wyndmoor Learning Ctr. v. City of Wilmington*, No. 93-4217, 1996 U.S. Dist. LEXIS 3103, at *15 (E.D. Pa. Mar. 12, 1996) (court record).

*subjective* beliefs regarding what Mylan thought was or was not material (despite

objective manifestations, such as what Mylan told Endo and wrote in its unilateral

January 24 draft, to the contrary).  As discussed further below, many of the district

court's core factual findings do not survive clear error review; but even accepting

*arguendo* the erroneous factual findings of the district court, controlling legal

precedent dictates that the parties never reached an enforceable agreement and the

decision must be reversed.

### 1.   The District Court Ignored An Open "Threshold" Issue

The parties agree that there were four threshold terms under

discussion from the start of their negotiations (A2736-37, 2763-64, 2784, 2785)

and that during the January 28 phone call the parties discussed all four of them

(A2673-74, 2695-96, 2703, 2767, 2779-80, 2796), including the ▉▉▉▉▉▉

▉▉▉▉ (*see* A2667-68). However, the district court ruled that ▉▉▉▉▉▉

became "non-material" over the course of the parties' negotiations based on

testimony of Mylan's subjective, unexpressed intent that it no longer needed that

term, and despite uncontested evidence that:

    (a)   Mylan raised this as a "threshold term" at the start of the

           parties' negotiations as something it required in order to

           settle.  (A2736-37, 2746, 2785; *see* A4-5, 34.)

*CONFIDENTIAL MATERIAL REDACTED*

(b) Mylan never informed Endo it was abandoning this required term. (A2703, 2736, 2747, 2802; *see* A35.)

(c) Endo and Mylan discussed ████████████████ periodically during negotiations but the details were held in reserve until the parties were closer to an agreement on the other three threshold terms. (A2668, 2737, 2794.)

(d) Mylan included █████████ in a draft settlement agreement sent to Endo on January 24. (A2665-68, 2671, 2777-78; A3053-54 at § 8(b); *see* A13.)

(e) During the January 28 call, Endo explicitly cited ███ ████████████████ as one of the "significant issues" that required resolution before any settlement could be reached. (A2676, 2767; *see also* A2695-96, 2779-80, 2796.)

(f) Mylan's only response to Endo's rejection of Mylan's January 24 draft, ████████████████████████ ████████████ was that Endo should take the January 24 draft and "mark it up" (A2695-96, 2777-79; *see* A36-37.)

The two participants in the January 28 call, in-house counsels to Endo and Mylan, each agree with the facts stated above. Hearing witnesses confirmed Mylan never told Endo that Mylan would withdraw ████████████ or that Mylan no longer considered that term material to a final agreement. Mylan's later-asserted subjective view that the term was immaterial cannot supplant uncontested objective evidence demonstrating that this term was in fact material before Mylan lost on the merits.

## 2. The District Court Ignored Other Open Terms

The district court also committed clear error in finding that the many additional terms proposed by Mylan in its draft settlement were "non-material."

████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████ In view of the many unresolved and important outstanding terms, the district court erred in finding a complete "offer" and "acceptance" based on the parties reaching a consensus on just the few initial terms of a complex and multifaceted negotiation but still having significant open issues.

### 3. The District Court Improperly Applied a One-Way Test, Allowing Mylan to Declare Settlement Even Though Endo Never Could Have

The lower court's error is clear when viewed from the perspective of what would have happened **if** the Merits Decision instead had been in Mylan's favor.

Mylan's position under the district court's ruling gave Mylan an opportunity to achieve its maximum gain if it won on the merits, and a safety valve minimum if it lost (a "heads I win, tails you lose" scenario): If Mylan invalidated Endo's patent, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ without worry of Endo claiming settlement given that Endo had explicitly stated that "significant issues" remained; but if Mylan lost on the merits – as it did – then Mylan could (and did) unilaterally "disclaim" the open, significant terms and declare settlement based upon the partial agreement (a better result than a complete loss on the merits). This illogical result, whereby one party – Mylan – effectively has independent control over whether or not prior unfinished settlement discussions constitute an enforceable agreement, reveals the legal and factual errors underlying the district court's analysis. Mylan cannot create an agreement where none existed, and the district court committed clear error by finding a settlement.

### 4.    The Chilling Effect of the District Court's Decision

The lower court's ruling is not only unsupported by precedent and fundamentally unfair to Endo, but it will also chill settlement negotiations if affirmed. While Mylan may assert that the district court's ruling vindicates public policy in favor of settlement, it actually does a great disservice. Among other things, the ruling discourages incremental dialog in favor of only formal discussions.

Throughout negotiations, the parties addressed and reached agreement on individual terms in ordered succession. Discussions started with four threshold terms that Mylan wanted: ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ On January 28 Mylan called and agreed to ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Endo's counsel responded "[t]hat's great," but also said that "significant issues" still remained to be resolved. (A2676) It was a "very quick phone call," about a minute or 90 seconds. (A2696, 2717.)

11

This was part of the logical, time-tested, orderly progression of negotiating term-by-term, but the lower court treated it otherwise. The only way for a party to protect itself against the district court's rubric is to refuse to agree to *any* term until *every* term is acceptable. This result defies logic, and in the future will cause negotiating parties to avoid otherwise beneficial incremental interactions to reach an agreement.

## B.    The District Court's Improper "Judicial Estoppel" Order

Endo also appeals from the district court's ruling during trial that Endo abandoned its claims Mylan infringed the '611 and '871 patents and therefore Endo was judicially estopped from pursuing those claims against Mylan. As a result of clearly erroneous factual findings and a misapplication of the law of judicial estoppel, the lower court improperly and unfairly extinguished Endo's property rights in the two patents. These errors cannot be allowed to stand.

Mylan asserted as a defense that the '611 and '871 patents were invalid for obviousness-type double patenting over the '864 patent. The '864 patent issued first but received a Patent Term Extension restoring some time lost in regulatory review (pursuant to the Hatch-Waxman Act, codified at 35 U.S.C. § 156) and so expires after the later-issued '611 and '871 patents. Endo disputed the double patenting assertions, but also believed that the '864 claims effectively subsumed all issues presented by the '611 and '871 patents, and so a week before

trial Endo submitted a terminal disclaimer to the United States Patent Trademark Office ("USPTO") for the '611 and '871 patents. As Endo explained in a letter to the district court informing it of the submission, the terminal disclaimer "obviated the underlying legal issues that would require analysis under Mylan's double patenting theories." (A1426-29.) (As this Court is well aware, the law of double patenting and the related role of earlier-issued but later-expiring patents is an issue in flux, *see e.g.*, *Gilead Sciences v. Natco Pharma Ltd.*, No. 2013-1418, 2014 U.S. App. LEXIS 7494 (Fed. Cir. Apr. 22, 2014), and so the terminal disclaimer should have simplified issues but instead complicated them for the district court.[3])

Despite Endo's repeated statements that it had no desire to abandon its claims to the '611 and '871 patents (*see, e.g.*, A1706, 1709), and the legal truism that Endo could have waited and filed a terminal disclaimer even after there was an adverse ruling, *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1375 (Fed. Cir. 2005), the district court held that Endo was judicially estopped from pursuing those claims. No evidence is present here to support that decision. The lower court further did not make **any** of the required factual findings necessary to invoke this doctrine, but instead said judicial estoppel will "make [the case] cleaner."

---

[3] They also appear to have complicated issues for the USPTO. After initially accepting the terminal disclaimer, the USPTO then withdrew that acceptance because the '864 patent is a later-expiring patent. Endo is currently working with the USPTO to resolve this issue.

(A1710.)  That is not a proper standard for judicial estoppel, and the district court's improper judicial estoppel ruling should be vacated.

## STATEMENT OF FACTS

### A.  Parties and Products

Endo is in the business of developing, manufacturing, and selling healthcare products, including pharmaceuticals and medical devices.  Mylan is in the business of selling generic versions of brand pharmaceutical products and is one of the largest generic drug companies in the world.  Mylan Pharmaceuticals Inc. is a wholly-owned subsidiary of Mylan Inc.

The product at issue is FROVA, and Endo is the owner of the approved New Drug Application ("NDA") No. 21-006 for FROVA (frovatriptan succinate) oral tablets, 2.5 mg, for the acute treatment of migraine attacks with or without aura in adults.  FROVA represents a major advance in the treatment of migraine.

Migraine is a chronic neurologic disorder characterized by episodic attacks of severe headache associated with autonomic and gastrointestinal symptoms, usually accompanied by nausea, vomiting, and/or sensitivity to light, sound, or movement.  (A822-23.)  Unsuccessfully treated, migraine attacks typically last 4 to 72 hours with a 24-hour median.  (A4429.)  Migraine affects

more than 28 million people in the U.S., with a higher prevalence in women (about

17%) than men (about 6%).  (A4429-30.)

FROVA provides an effective and safe long-duration migraine

treatment with a low recurrence rate and reduced side-effects, suitable even for

preventive treatment of certain migraines. (A4438-39.) It is part of a class of

migraine treatments known as triptans, but physicians regard Frova as not directly

substitutable for other triptans.  (A4437-38, 4439, 4467, 4469-70, 4471.)  Prior to

its introduction, certain types of migraine were considered to be an unmet

treatment challenge, but FROVA met that need (A4438-39), with a longer duration

of action than other triptans (A4460-62), an elimination half-life of about 25-26

hours compared to 2-6 for all the other triptans (A4460, 4472, 4462-63, 4465), and

the lowest reported headache recurrence rate of any triptan (A4462, 4465, 4475;

4601-02).  Moreover, although other triptans have shown serious cardiac adverse

events, leading the FDA to have a class 'black box warning,' several studies have

failed to show these cardiac adverse effects for frovatriptan (A4447-48, 4483).

Frova was the sixth of seven FDA-approved triptan products to enter

the market, which typically puts a product at a disadvantage in obtaining market

share. (A5049-50.)  Additionally, there are already generic versions of many other

triptans.  Nevertheless, FROVA has been accepted and its market share in the

overall triptan market has increased while maintaining its average selling price

(A5055-56), whereas other branded triptans have not been able to maintain their prescription market shares (A5066-68, 5070).

### B. The Patent Litigation

The '864, '611 and '871 patents are listed in the FDA's list of *Approved Drug Products with Therapeutic Equivalence Evaluations* (the Orange Book) for FROVA. Although the '864 issued before the other two patents, it was granted a Patent Term Extension under 35 U.S.C. § 156 extending the date of its expiration to November 8, 2015, after the other two expire. (A118-19.)

In July 2011, Mylan notified Endo that it had filed an Abbreviated New Drug Application ("ANDA") with the FDA seeking approval to market a generic version of FROVA (Mylan's "Generic Frovatriptan Product") in the United States prior to patent expiration. On August 16, 2011, Endo filed suit. Although Endo filed this case in the District of Delaware, it was tried to a District of New Jersey judge pursuant to 28 U.S.C. § 292(b) (ECF 175) between November 12, 2013 and November 21, 2013.

At the start of trial, Mylan conceded that its Generic Frovatriptan Product infringed the asserted claims of the '864, '611 and '871 patents under the district court's prior claim construction, while reserving the right to appeal that construction. (The first day of trial included some infringement evidence, while issues concerning Mylan's concession were considered by the district court.)

Thereafter, Mylan pressed only its invalidity defenses, maintaining that the

asserted claims in all three patents were invalid on one or more of the following

bases:  (a) anticipation, (b) obviousness, (c) written description, and

(d) enablement; and that the '611 and '871 patents were invalid for obviousness-

type double patenting.

### C.    The District Court's Judicial Estoppel Ruling

On October 30, 2013, Endo filed a terminal disclaimer with the

USPTO pursuant to Manual of Patent Examining Procedure §804.02(IV)

disclaiming the "terminal part of the term[s]" of the '611 and '871 patents that

extend beyond the expiration of the full term of the '864 patent (including any

patent terms extensions) and committing to keep the patents commonly owned.

Endo advised the district court of the filing, indicating that the terminal disclaimer

"renders moot the obviousness-type double-patenting arguments made by the

Mylan Defendants."  (*See* A1412-16.)

Mylan argued *inter alia* that the court should reject the terminal

disclaimer and permit trial to move forward on the question of whether the '611

and '871 patents were invalid for obviousness-type double patenting.  (*See* A1417-

25.)  (Obviously, Mylan recognized that the two patents were still in the case.)

Endo disagreed (*see* A1426-29), and pointed out that the terminal disclaimer, in

17

fact, simplified the issues for trial by removing any double patenting issues from the case thereby "allow[ing] a cleaner presentation of the issues." (A1429.)

On November 13, 2013 the court invited Mylan to make an oral presentation on its objections to Endo's terminal disclaimer. (A1683.) Thereafter, the court issued a ruling from the bench judicially estopping Endo from pursuing Mylan's infringement of the '611 and '871 patents. (A1706-08, A1710.)[4] Although the court recognized that the terminal disclaimer "mooted" Mylan's obviousness-type double patenting defense (A1685), it also expressed its belief that a terminal disclaimer was evidence of Endo's intention to *drop* its infringement charge against Mylan on the '611 and '871 patents. (*See, e.g.*, A1686 ("Mylan is not threatened by those patents as a result of the filing of the disclaimer."); A1686 ("[A]s a result of the disclaimer you no longer have any threat of prosecution.").) The court expressed this view *before* Endo had the opportunity to formally address the court on the issue.[5] Thereafter – and *still* before Endo had the chance to

---

[4] The Merits Decision includes a section on judicial estoppel. (*See* A1948-2055.) The court's April 8, 2014 Rule 60 Opinion and Order (A1-39) vacated the Merits Decision and Order but is silent as to trial orders. To the extent this appeal seeks reinstatement of the Merits Decision, Endo does not seek reinstatement of the judicial estoppel portion of that decision.

[5] Endo indicated a desire to present slides to the district court on the terminal disclaimer topic and "to address at an appropriate time your honor's question and the issue of the [e]ffect of the terminal disclaimer." (A1703-04.) Endo was not afforded an opportunity to make a formal presentation to the court prior to its oral ruling estopping Endo from pursuing its rights in the '611 and '871 patents.

respond – Mylan noted that the court's impression was inaccurate and that the

infringement issue was still present:

| Mylan: | ... I think Endo is claiming if you allow their terminal claims to moot our defense that **their claims for those patents still continue**. |
|---|---|
| Court: | But not as to Mylan. |
| Mylan: | I'm sorry, Judge, and maybe we've been s[p]eaking at cross purposes. **Endo has in no way suggested they are going to give up those patents and not assert those patents against us, they just want our defense mooted**. This defense mooted. |
| Court: | No. |
| Mylan: | That's what they are saying. |
| Court: | No. |
| Mylan: | That's absolutely – oh, I'm sorry Judge, I thought we were talking at – we seem to be talking at cross purposes, your Honor…. |

(A1698-99 (emphasis added).)

Mylan was correct; Endo had not surrendered its charges of patent

infringement. When Endo was allowed to respond orally, it also expressed its

position that, since the sole Mylan defense *unique* to the '611 and '871 patents

(i.e., double patenting) was now moot, it would simplify trial if the parties focused

on the '864 patent since that would be dispositive of the other validity challenges

to the '611 and '871 patents. (A1700 ("everything rises and falls on the '864

patent, we can litigate the '864 patent and that will govern what occurs in the

case.").) When the court pointedly asked, "[D]o you, Endo, agree that you no

longer would have any claims against Mylan on the remaining two patents" (A1700), Endo <u>disagreed</u> (s*ee* A1708-09 ("I do have a problem with it, your Honor. … [T]he effect of the terminal disclaimer is the '611 and '871 are still in the case")).  As Endo explained in its response to the judge's questions, the terminal disclaimer is "different than a covenant not to sue." (A1701.)

      Despite this, the district court appeared to conclude that Endo's offer to stipulate that "everything [the '864, '871, and '611 patents] rises and falls on the '864 patent" was evidence of an intent to abandon its property rights in the '611 and '871 patents.  (A1700.)  Based on a misunderstanding of the law on terminal disclaimers, (A1709), the district court ordered that "[Endo]… no longer wish[es] to pursue the '611 and the '871 ... they are out of the case, and Endo is estopped from further pursuing any cause of action against Mylan for those two patents on this ANDA."  (A1706-07.)[6]  Endo expressed its immediate disagreement and again explained its position that a terminal disclaimer "doesn't terminate the infringement claim," (A1709), and repeated that it had only proposed that the parties stipulate that the outcome of the trial on the validity of the '864 patent control the outcome with respect to the '611 and '871 patents.

---

[6]  The court even wrongly attributed to Endo's counsel *his agreement* with the court's finding of judicial estoppel.  (*See* A1705.)

Mylan considered this proposed stipulation but proposed to the court that the stipulation require a "**dismissal with prejudice** of all claims under the '611 and '871 patents." (A1708 (emphasis added).) Endo again disagreed and clarified that it was *not* offering to dismiss the '611 and '871 patents, but only to have the outcome of the trial on these patents be governed by the '864 patent outcome. (A1708.) The court continued to say that a terminal disclaimer removes patents from the case entirely as soon as it becomes effective (A1709) and Endo again disagreed, saying it "doesn't terminate the infringement claim." (A1709.) Nonetheless, the court issued an oral ruling "judicially estopp[ing] Endo from further prosecuting Mylan on the '611 and the '871 patent in the current ANDA." (A1710.) Accordingly, Endo was precluded from asserting its property rights in two out of three patents.

### D.   Post-Trial Settlement Discussions and Mylan's Motion To Enforce a Settlement

Endo and Mylan had preliminary settlement discussions prior to trial. (A2649.) During trial there were perfunctory discussions between Endo's in-house counsel, Guy Donatiello, and Mylan's in-house counsel, Andrea Tiglio, about settling the case, but no agreement was reached. (A2649, 2750.) After trial, and at the district court's instruction to pursue settlement (A2649), Donatiello met on numerous occasions in person and by telephone with Tiglio as well as another in-house Mylan counsel, Minaksi ("Mini") Bhatt, to discuss settlement. (*E.g.*,

21

A2649-59, 2736-38, 2739-40.) Donatiello, Tiglio and Bhatt were the three

witnesses to testify at the post-trial hearing on Mylan's settlement motion.

From the start, the parties focused on four threshold issues that had to

be resolved before other material terms could be negotiated: ███████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████ (A2736-37, 2763-64, 2784, 2785.) Mylan

insisted ███████████ at the very beginning of the negotiations. (*See* A2668,

2736-37, 2746, 2785.)

The parties addressed each of these terms in turn, negotiating one at a

time and, once resolved, moving on to the next term. (*See*, *e.g.*, A2739-41 (Bhatt

describing process by which the parties had a number of conversations and

"[i]ncrementally" resolved each of the first three threshold terms); A2788

(Donatiello explaining that calls were often "perfunctory" and addressed discrete

changes, such that not every term at issue in their negotiations was discussed on

each call).) Although they chose to first focus on these four "threshold" terms,

neither party communicated that these were the *only* terms that mattered, and both

parties expected that any final settlement would include other terms and be reduced to writing (*see* A2763-64).

Mylan initially wanted ███████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████. (A2736-37, 2750, 2785.) These issues were negotiated incrementally, with the details of ████████████ ██████ saved for fourth (although conceptually acceptable, subject to specifics). (A2737, 2751, 2772; *see also* A5.)

By December 2013, the parties had reached an agreement that Endo would pay ████████ towards Mylan's attorneys' fees. (A8; *see* A2653.) By January 7, the parties believed that they had also reached an agreement that Mylan could █████████████████████████████████████████████████████ █████████████████. (A10.) (As discussed below, ████████████████, the parties did not in fact reach a meeting of the minds on this term, since during their negotiations they had materially different interpretations of the actual meaning of "four weeks.")

On January 10, 2014, Mylan proposed ████████████████████ █████████████████████████████████████████████████████, and Endo responded ████████████████ (A2760-61, 2790.) Mylan's in-house

23

CONFIDENTIAL MATERIAL REDACTED

counsel indicated that this change required senior Mylan approval (A2790.)  Endo

then waited weeks for a response.  (A2761, 2800-01.)  That delay lasted for 2½

weeks, until the January 28 call when Mylan said that term was accepted.  (A2673-

74, 2767.)

These discussions reflect the piecemeal, iterative process of the

parties' negotiations – they endeavored to compromise on individual terms, with

the understanding that an agreement would not be final and enforceable until they

had agreed on others necessary for a complete agreement.

In the meantime, on Friday, January 24, 2014, Tiglio sent an

unsolicited draft settlement agreement to Donatiello (the "January 24 Mylan Draft"

(A3048-68)).  In the cover email to that draft, Tiglio wrote: "We are still awaiting

final management approval, but in the meantime, in order to keep the ball rolling,

we have put together a draft settlement and license agreement for your review."  (A

3047; *see* A2665-66.)  Tiglio also wrote that Bhatt "has been out of the office this

week…so she may have revisions when she gets a chance to review." (*Id.*; *see also*

A2688-89.)

The January 24 Mylan Draft contained Mylan's interpretation of the

few terms the parties had already discussed, but it also included a number of

additional terms that the parties had never even mentioned in the negotiations.  For

example, while the agreement states the agreement for Endo ███████████

24



████████████████████████, it also included payment terms that had never

been discussed – ████████████████████████████████████████████████

(A2697) – which Donatiello testified would not have been agreed to by Endo

(A2794).

Significantly, the January 24 Mylan Draft also provided that the

"████████████████████████████████████████████████████████

████████████████████████████." (A3053 at 8(a)(i); *see* A2694.)  This did

not comport with Endo's understanding – nor the literal meaning – ██████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ (*See* A2153-54 at ¶¶ 12-13; A2792.) ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ so the difference of when ████████████████████ is

unquestionably material, as Donatiello testified (A2772-73).

Throughout their discussions, the parties agreed to hold off

negotiating the details of a ████████████████████ until the other threshold issues

were resolved.  Nonetheless, the January 24 Mylan Draft specified ██████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

25

██████████████████████████████████████████████████████

████. (*See* A3053-54 at § 8(b).)  On direct examination Tiglio testified – in an

attempt to buttress her testimony on why Mylan did not consider that term relevant

here – that ██████████████████ proposed by Mylan only allowed ████

██████████ (A2669-70), but on cross-examination she admitted that Mylan's

draft ████████████████████ (A2696-97).

The details of ██████████████ were entirely new, never discussed

with Endo, and Donatiello explained that the terms were "incredibly important to

[Endo] because that's a lot of money at stake."  (A2696, 2747, 2772-73.)  The draft

also included additional never-before discussed terms with other new triggers that

could allow Mylan to launch immediately – which had never been discussed with

Endo.[7]

The January 24 Mylan Draft also gave Mylan the right to engage in

████████████████████████████████████████████████████

██████████████████████████████. (*See* A3051 at § 3.)  In other

words, █████████████████████████████████████████████

---

[7] The █████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████



████████. The parties had never discussed this term. (A2692.)

The parties also had never discussed various other provisions Mylan included in the January 24 Mylan Draft, such as those that ████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████ (*See* A2692-94, 2698 (Tiglio confirming that these terms never discussed with Endo).) (As detailed further below, on the January 28 phone call Endo's Donatiello rejected the terms as set out in the January 24 Mylan Draft. (A2796.))

On January 28, 2014, at around 11:44 am EST, Tiglio called Donatiello on his cell phone after calling his office and learning he was traveling. According to Tiglio the entire phone call lasted approximately one minute or 90 seconds. (A2696, 2717.) Tiglio told Donatiello that Mylan would agree to the proposal Endo made 2½ weeks earlier regarding ████████████ ████████████████████████ instead of the ████ ████ Mylan had proposed. (A2674, 2719, 2767.) Donatiello responded, "That's great," (A2674, 2767; *see* A16) and then – as Tiglio admits – *Tiglio* explicitly

27

asked if Donatiello had reviewed the January 24 Mylan Draft (A2674; *see* A16).

Donatiello responded that he was traveling and had briefly done so, but there were

"significant issues to be resolved before any settlement could be completed."

(A2767.) (Tiglio agreed with this characterization during her direct examination

(A2676).)  In particular, Donatiello explained that several points proposed in

Mylan's draft, including the ████████████████, were unacceptable to Endo,

and Tiglio responded that Donatiello should "mark it up."  (A2695-96, 2777-79,

2796.)

    If Mylan truly believed at this point that the ████████████████ and

other terms in the draft were no longer required, as the district court found, Tiglio

could have said so – but she did not.  (A2702-03.)  Instead, she told Donatiello to

"mark [] up" Mylan's proposal – clearly showing the new terms and trigger were

still at issue.  (*Id.*)

    These objective manifestations demonstrate that (1) the parties did not

believe they had reached agreement on all terms and instead contemplated further

negotiations with the next identified counter-offer being Endo's mark-up;

(2) Mylan had not dropped but rather continued to pursue the various additional

terms in its draft, including its ████████████████; and (3) Endo had

"significant issues" with certain of those terms – which had "to be resolved before

any settlement could be completed."  (A2676, 2767.)  In other words, there was

28

never a complete and final "offer" and "acceptance" – rather, the parties agreed to some individual terms, but a final agreement would incorporate those terms conditioned on the parties' resolution of the remaining open terms.

During the hearing on Mylan's settlement motion, Mylan's witnesses attempted to denigrate these open issues by calling them mere "boilerplate" or "belt and suspenders" (A2667), and said that Mylan had _internally_ decided these other terms, and in particular ███████████████, "didn't have that much relevancy to the circumstance." (A2668-69.) The district court likewise repeatedly referred to findings on what "Mylan had determined" internally (A6; _see_ A34), as well as the materiality of certain terms "[i]n Mylan's view" (A13), and according to Mylan's "subjective belief" (A35). Tiglio and Bhatt admitted, however, that they never communicated these internal determinations or subjective views to Endo in any fashion (A2703, 2747; _see_ A2802). And when asked why Mylan still included ██████████████ in their January 24 draft agreement – if it was in fact irrelevant as Tiglio testified – Tilgio admitted that Mylan would "prefer it to be in there." (A2671.) [8]

---

[8] Elsewhere, Mylan similarly admitted that other new terms in the agreement comprised "provisions that we like to have" and which "Mylan prefers" (A2667), and that ██████████████ in particular is a "provision that Mylan prefers to have in its agreements" (A2697).

During the January 28 call, Mylan proposed sending a joint letter to the district court saying that the parties had progressed in their settlement discussions. Given the progress, and the district court's prior requests for settlement discussion updates, Donatiello agreed that the parties could submit a joint letter on the status of their negotiations. (Donatiello explained that he agreed to update the court since he believed the parties were at a point where they "*could reach agreement*" on the remaining terms, but emphasized that there were still multiple "critical" terms that had not been resolved, and that in the past he had seen settlement discussions "fall[] apart" over such terms. (A2772-72 (emphasis added).)) Tiglio suggested the letter ask that the district court judge "hold her decision in abeyance," but Donatiello did not agree to that. (A2675-77, 2771.) Donatiello asked that Mylan send a draft of the proposed letter to Endo's counsel for advance approval.[9] (A2155-56 at ¶ 18.)

Less than twenty minutes after this call, the district court issued its Merits Decision and Order, finding in favor of Endo and rejecting each of Mylan's defenses to the asserted '864 claims. (A1948-2055, 2991-92; *see* A2677-78,

---

[9] Tiglio testified that Donatiello "dictat[ed]" the contents of the letter including a statement that all material terms were resolved. (A2675.) Donatiello strongly refuted Tiglio's testimony in this respect. (A2769-70.) As Donatiello testified, he would "never say it was all material terms" and "never think that we've reached full agreement" based on the status of the parties' discussions at that juncture. (A2772-73.) The district court did not make a factual finding on this discrepancy.

2773.)  Approximately a half an hour later, Mylan sent a letter to the court stating that there had been a settlement. (A2058-59.)  Mylan's letter – which Endo did not see in advance – did not address the fact that Donatiello specifically informed Mylan that there were "significant issues to be resolved *before any settlement could be completed*."  (A2676, 2767 (emphasis added).)  Soon thereafter, Bhatt and Tiglio called Donatiello, telling him that they believed the Merits Decision was irrelevant and that the parties had an enforceable settlement.[10]  (A2679, 2743-44, 2774-75, 2798-99.)  Donatiello responded that the parties did not have an enforceable agreement and that significant terms remained open.  (*Id*.)  During that call, Bhatt and Tiglio also stated that negotiations between the parties should continue.  (A2774-75.)

On February 3, 2014 Mylan filed its Motion to Enforce Settlement Agreement (A2068-72).  On February 25, Mylan filed a Rule 60(b) Motion for Relief from the January 28, 2014 Order (A2232-38).  On March 18, 2014, the district court held a hearing on Mylan's Motion to Enforce Settlement Agreement, during which the court heard testimony from Donatiello, Tiglio and Bhatt.

---

[10] Notably, despite Mylan's assertion that the parties reached a settlement on January 28, 2014, as of March 18, 2014 (and to Endo's knowledge, to this day), Mylan has never informed the Federal Trade Commission and Department of Justice of the purported oral settlement, as required by §§ 1112-13 of the Medicare Modernization Act, Pub. L. 108-173, 117 Stat. 2461-63 (2003).  (A2702.)

## E.     The District Court's April 8, 2014 Order

On April 8, 2014, the district court granted Mylan's Motion to

Enforce (A1-39, A40-42), depriving Endo of the full life of its patents and

awarding Mylan $1.5 million; in other words, the district court found that the brief

call without any documentation resulted in a settlement worth millions of dollars,

despite uncontroverted statements that there were "significant issues" that

remained open.

In view of this ruling, the district court *inter alia* granted Mylan's

Rule 60(b) motion and vacated its Merits Decision and Order.  The district court

also ordered the parties to execute a written settlement agreement consistent with

the court's April 8 Order and Opinion.  Endo thereafter timely filed the present

appeal (A3079-82), and moved the district court for a stay of its order that the

parties execute a written settlement agreement pending resolution of this appeal

(A3510-33).   In an oral ruling on June 19, 2014, the court denied Endo's motion.

## STANDARD OF REVIEW

In an appeal such as this from a judgment rendered under state law,

this Court applies the law of the regional circuit from which the appeal arose.[11]

---

[11] *See Regents of the Univ. of New Mexico v. Knight*, 321 F.3d 1111, 1117 (Fed. Cir. 2003); *see also Sanofi-Aventis v. Apotex Inc.,* 659 F.3d 1171, 1178 (Fed. Cir. 2011) (citing *Novamedix, Ltd. v. NDM Acquisition Corp.*, 166 F.3d 1177, 1180 (Fed. Cir. 1999) ("Because the interpretation of a settlement agreement is not an issue unique to patent law, we apply the law of the appropriate regional circuit.").

The Third Circuit has explained that a district court's enforcement of a settlement agreement "closely resembles a grant of summary judgment," and enforcement is appropriate "only if 'there is no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law.'" *Tiernan v. Devoe*, 923 F.2d 1024, 1031-32 (3d Cir. 1991) (quoting Fed. R. Civ. P. 56(c)).[12] Appellate review "of the district court's application of this standard is plenary." *Id*. (citing *Erie Telecomms., Inc. v. City of Erie*, 853 F.2d 1084, 1093 (3d Cir. 1988)).

In *Tiernan*, the Third Circuit indicated, in *dicta*, that if the district court had conducted an evidentiary hearing and made <u>*explicit*</u> factual findings, those would have been reviewed for clear error; however, on the record before it in that case, the Third Circuit adopted the summary judgment approach. *See*, *e.g.*, *Tiernan*, 923 F.2d at 1031 n.5 (citing *Borne v. A & P Bd. Rentals No. 4, Inc.*, 780 F.2d 1254, 1258 (5th Cir. 1986) (*per curiam*)).

In any event, to the extent that necessary factual findings are not made or are ambiguous, review is plenary and all factual inferences should be drawn in

---

[12] *See also Maya Swimwear,* 855 F. Supp. 2d at 233-34 (citing *Tiernan*, 923 F.2d at 1031-34) ("Because motions for the enforcement of settlement agreements resemble motions for summary judgment, the court must employ a similar standard of review … [T]he court must treat all the non-movant's assertions as true, and when these assertions conflict with those of the movant, the former must receive the benefit of the doubt.") (internal quotation omitted); *Intellisource Grp., Inc. v. Williams*, No. 98-57-SLR, 1999 U.S. Dist. LEXIS 12446, at *10 (D. Del. Aug. 11, 1999) (citing same); *AT&T Corp. v. Mosaica Educ., Inc.*, No. 03-1012 GMS, 2008 U.S. Dist. LEXIS 52594, at *6-7 (D. Del. July 10, 2008).

favor of the non-moving party, as with a motion for summary judgment. *Tiernan*, 923 F.2d at 1031-32. Further, an appellate court should review *de novo* questions of law, including whether the facts established on appeal (in accordance with the review set forth above) are sufficient to establish an enforceable settlement under a proper application of controlling law. *See*, *e.g.*, *California Sun Tanning USA, Inc. v. Elec. Beach, Inc.*, No. 08-4843, 369 Fed. Appx. 340, 346 n.6 (3d Cir. 2010) (finding that the court's "review of the *existence* and legal consequences of a settlement agreement is plenary," whereas "*explicit* findings of fact" are reviewed "for clear error") (emphasis added). Endo asserted that the controlling substantive law should be Pennsylvania law since most all communications were within Pennsylvania, whereas Mylan asserted that it could be either Delaware or Pennsylvania law. The district court applied the law of the forum state, *i.e.*, Delaware law, which it determined was not in conflict with Pennsylvania law. (*See* A21-22.)

Whether judicial estoppel applies also is a matter of regional circuit law. *3M v. Chemque, Inc.*, 303 F.3d 1294, 1302 (Fed. Cir. 2002). In the Third Circuit, a district court's ruling on judicial estoppel is reviewed for abuse of discretion. A court "abuses its discretion when its ruling is founded on an error of law or a misapplication of law to the facts." *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 780 (3d Cir. 2001). Findings of fact are

reviewed for clear error, Fed. R. Civ. P. 52(a)(6), and are clearly erroneous when the reviewing court is left with a definite and firm conviction that a mistake has been committed. *United States v. Gypsum Co.*, 333 U.S. 364, 365 (1948).

## ARGUMENT

## I. THE PARTIES DID NOT REACH AN ENFORCEABLE AGREEMENT WHERE TERMS WERE EXPRESSLY UNRESOLVED

The district court's procedural errors and misapplication of the burden of proof and standard of review, as well as its factual errors, compel vacating and reversing the April 8 settlement decision and judgment. Applying the appropriate standard of review and burden, and in view of the uncontested evidence regarding the parties' settlement discussions, the district court was incorrect in holding that the parties' preliminary and incomplete settlement discussions became an enforceable agreement. This matter should be remanded to the district court for reinstatement of its initial January 28 Merits Decision and judgment concerning Mylan's infringement.

**A.     District Court Failed to Apply Appropriate Standard and Burden of Proof for Judicial Enforcement of a Contested Settlement Agreement**

In order to establish that a settlement exists, Mylan had the burden to show a valid oral contract. *Lannett Co. v. Celgene Corp.*, No. 08-3920, 2011 U.S. Dist. LEXIS 32915, at *6 (E.D. Pa. Mar. 29, 2011) ("The burden of proof is on the party attempting to enforce the settlement to establish that the parties reached an oral agreement." (citations omitted)).  The district court determined that a preponderance of the evidence standard should apply under these circumstances (A22 n.14), however, the Opinion demonstrates that Mylan was not held to this standard – at every juncture the district court treated Endo as though it had the burden to prove that the parties' discussions did *not* rise to the level of an enforceable agreement.  (*E.g.*, A32-38 (finding that Endo failed to show that other terms discussed by the parties were essential to a final agreement).)  This was never Endo's burden, and it was error for the district court to act as if it was.

Moreover, on multiple occasions the district court referred to facts disputed by Endo as "undisputed," and it effectively disregarded uncontested evidence showing (i) that open terms still existed (including the numerous additional terms Mylan injected into the parties' negotiations via the January 24 Mylan Draft), (ii) Endo's rejection of those terms during the January 28 call, and (iii) Mylan's invitation to mark up the January 24 Mylan Draft in an attempt to

reach agreement on the "significant issues to be resolved before any settlement could be completed."

## B. The Parties Never Reached an Enforceable Settlement Agreement As A Matter of Law

An enforceable agreement must satisfy three requirements: "(1) both parties must manifest an intent to be bound by the terms of the agreement; (2) the terms must be sufficiently definite to be enforceable; and (3) the agreement must be supported by consideration." *Quandry Solutions Inc. v. Verifone Inc.*, No. 07-097, 2009 U.S. Dist. LEXIS 31459, at *25 (E.D. Pa. Apr. 13, 2009) (applying Pa. law); *Intellisource*, 1999 U.S. Dist. LEXIS 12446, at *12 (applying Del. Law). Evidence of preliminary negotiations, or even an agreement to agree in the future, does not create a contract. *Quandry*, 2009 U.S. Dist. LEXIS 31459 at *27; *Mazzella v. Koken*, 559 Pa. 216, 225 (Sup. Ct. Pa. 1999).

Even taking into account the district court's factual findings, there was no showing of the "material and necessary details of the bargain," *Quandry*, 2009 U.S. Dist. LEXIS 31459 at *37; *Intellisource*, 1999 U.S. Dist. LEXIS 12446 at *12, and the district court's judgment should be reversed on a plenary review of this legal question. But even more, many of the district court's factual findings in support of its judgment do not survive clear error review. The evidence demonstrates that there was never a complete "offer" and "acceptance," the parties

did not reach an agreement on all material terms, and the objective manifestations show they did <u>not</u> intend to be bound by those preliminary discussions.

### 1. Parties Did Not Agree on All Material Terms

Nothing could make clearer that there are open issues than a direct statement to that effect. And the parties agree that such a statement was made on the January 28 phone call, when Endo said that there were significant issues to be resolved and Mylan invited Endo's mark-up of the January 24 Mylan Draft to show Endo's response (*i.e.*, counter-offer) on those significant open issues.

"[T]he fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance." *Chung v. Choi*, No. 07-2187, 2008 U.S. Dist. LEXIS 63180, at *7-9 (E.D. Pa. Aug. 18, 2008), aff'd, 2009 U.S. App. LEXIS 12445 (3d Cir. June 4, 2009) (citations omitted); *Intellisource*, 1999 U.S. Dist. LEXIS 12446, at *12 ("[T]here can be no contract when an essential term is missing.")(citation omitted); *Mazzella*, 559 Pa. at 228. Further, when a party proposes terms, agreement on their inclusion or even their exclusion must be reached before there is an enforceable settlement. *See Behrend v. Comcast Corp.*, No. 03-6604, 2012 U.S. Dist. LEXIS 137451, at *26-30 (E.D. Pa. Sept. 25, 2012) (no settlement agreement based on signed term sheet subject to further negotiation where party later proposed additional terms).

Here, the evidence clearly shows that ███████████████, as

well as a number of other terms raised by Mylan in its January 24 Draft, were

material and remained open when the district court issued the Merits Decision.

The district court clearly erred in finding that these open terms, with critical

economic ramifications for Endo, were "not material" or even mere "boilerplate."

And since these material terms remained open, there could not be a complete and

final "offer" and "acceptance" of all material terms, *i.e.,* no agreement.

    **a.**    ████████████████  **Remained a Material Term and Was Never Resolved by the Parties**

It is undisputed Mylan asked for a ███████████ at the start of

negotiations (A4; *see also* A2736-37, 2746, 2785), and that the parties discussed

this term during their January 28 phone call without reaching agreement (A2695-

96, 2779-80, 2796). It is also undisputed – and indeed the district court observed –

that "neither Bhatt nor Tiglio informed Donatiello that it [Mylan] considered the

████████████████ non-essential to settlement." (A35; *see* A36 ("Bhatt and

Tiglio acknowledge they did not explicitly convey this thought to Donatiello").)

And yet the district court, relying on testimony by Mylan's witnesses regarding

Mylan's *internal* analysis of this term (A6, 36), determined that this term implicitly

"became" immaterial. Even more, it held that Endo may be charged with

knowledge of Mylan's undisclosed "subjective belief as to its non-importance," on

the basis that Mylan "fail[ed] to raise or insist upon the term in any of the offers or counteroffers." (A35.)

This finding is flawed for several reasons. <u>First</u>, contrary to the district court's factual premise, Mylan continued to want the ███████████ as proven by its inclusion in the January 24 Mylan Draft; clearly that was Mylan again "rais[ing] or insist[ing]" on that term. <u>Second</u>, Bhatt raised ████████ ██████████ during the various discussions (as Donatiello testified but Bhatt said she does not recall doing so[13]). (*E.g.*, A2752-53, 2777.) <u>Third</u>, on the January 28 call, Tiglio specifically asked if Donatiello had reviewed the January 24 Mylan Draft, so that question alone implicitly raised ████████████ as well as the other terms new to the January 24 Draft. <u>Fourth</u>, Donatiello raised an explicit objection to the ██████████████ during this call, in response to Tiglio's question, and Tiglio invited him to counter-offer in a mark-up of the draft. <u>Fifth</u>, at no time during the call or prior to the district court's Merits Decision did Tiglio (or Bhatt) tell Donatiello that Mylan no longer considered the ██████████ important or withdrawn.

---

[13] Bhatt testified that the ████████████████ "never came up" after December 4th or 5th. (A2748.) But this testimony is manifestly unreliable, since both parties agree that Mylan included a ████████████████████ in its January 24 Draft Agreement, and that Tiglio and Donatiello discussed this term, including Endo's objections to Mylan's proposal, during the parties' final conversation before the Merits Decision.

Mylan's objective actions demonstrated that the ███████████████ was still an essential term in the negotiations, *Intellisource*, 1999 U.S. Dist. LEXIS 12446 at *12-13; this term was still material to a final settlement and unresolved on January 28.  The subjective beliefs that Mylan now claims it had prior to the district court's January 28 adverse judgment are unsupported by the parties' discussions and objective conduct, and in any event, irrelevant to any objective issues of contract formation.

The district court also improperly rested on its finding that "Endo would not have objected to eliminating the [███████████████] term altogether."  (A35.)  This conclusion similarly betrays the error in the court's analysis.  A court cannot manufacture a settlement on the basis of after-the-fact testimony regarding negotiations the parties *could* have had but never did.  Indeed, during negotiations that occurred in advance of the Merits Decision and judgment, Endo did in fact object to this term, and yet Mylan never actually withdrew it.  The option to "eliminat[e] the term altogether" was presented by Mylan only *after* the district court awarded judgment in favor of Endo on the '864 patent in the Merits Decision – a clear attempt by Mylan to salvage something from defeat.

Settlement is not a one-way street.  Mylan never manifested prior to decision and judgment that it would drop the terms in its draft, including the ███████████████.  Now that Mylan's incentives have changed, having lost on

the merits, it cannot unilaterally relinquish this term in order to create an

agreement that did not previously exist.

> **b. Discussion of Other Outstanding Terms and Further Negotiations Precludes Finding an Enforceable Settlement**

"[C]ontemplation of future negotiations prior to the execution of a

formal contract is strong evidence that the parties did not intend to be bound by

any preliminary agreement." *Quandry*, 2009 U.S. Dist. LEXIS 31459 at *36; *see*

*also Lannett*, 2011 U.S. Dist. LEXIS 32915 at *4-5 (no contract where

"negotiations were ongoing" and counsel wrote that "the parties will continue to

work towards resolution of this issue").

The court found that the "parties testified" that "[w]hat remained …

were 'additional boilerplate and conventional settlement language.'" (A31.)  This

finding is erroneous in multiple respects, not the least of which is that Mylan

admitted that the additional provisions in the draft comprised not only "boilerplate"

but also were "provisions that we like to have" and terms that "Mylan prefers."

(A2667.)  Donatiello testified at the hearing that some of the additional terms

proposed by Mylan in its January 24 Draft, the "starting point" for further

negotiations, were "critical" issues that were "incredibly important" for Endo –

either to modify to its satisfaction, or in some cases to avoid completely.  (A2772-

73.)  Indeed, the court credited this testimony – but determined that even if those

terms were in fact "important" to Endo and Endo had "significant issues" with them, this does not render those terms "essential." (A37 & n.29.)  Based on these factual findings alone, the district court erred in finding that the parties had agreed on and manifested an intent to be bound by all "material terms."

Notwithstanding Mylan's attempt to downplay the significance of these terms, they include objectively material provisions:  terms that would allow Mylan ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████ Mylan knew that Endo did not consider these outstanding items to be "boilerplate" or "immaterial" – much to the contrary, Endo informed Mylan that it had "significant" problems with these terms that had to be resolved before they could finalize a settlement.

The trial court's findings that the additional terms proposed by Mylan were "boilerplate," as well as its statement that both parties admitted to this during the hearing (A31), are both unsupported by the evidence of record and clearly erroneous.

**2.    Endo's Explicit Reservation That There Were "Significant Issues to be Resolved Before any Settlement Could be Completed" Precludes Finding an Objection Manifestation of Assent**

The objective evidence demonstrates that the parties did not manifest a mutual intent to be bound by their ongoing, interim negotiations.  Endo *explicitly* said otherwise.  (A2676; A2767 ("significant issues to be resolved ***before any settlement could be completed*.") (emphasis addd)).  The district court credited this testimony (A37 & n.29) but yet still found that Endo manifested an intent to be bound simply because Donatello first responded "That's great," and agreed to update the court on the parties' progress (A24-25).  The district court clearly erred in weighing indirect inferences over undisputed direct statements of an intent not to be bound.  While mutual assent "is sometimes referred to as a 'meeting of the minds,'" Restatement (Second) of Contracts § 17 cmt. c (1981), this phrase must not be construed too literally.  "*Acceptance is measured not by the parties' subjective intent, but rather by their outward expressions of assent*." *Morales v. Sun Constructors, Inc.*, 541 F.3d 218, 221 (3d Cir. 2008) (emphasis added).  "[A] contract comes into existence if a reasonable person would conclude, based on the *objective manifestations of assent* and the surrounding circumstances, that the parties intended to be bound by their agreement on all essential terms." *Maya Swimwear*, 855 F. Supp. 2d at 234 (quoting *Rohm and Haas Elec. Materials, LLC*

*v. Honeywell Int'l, Inc.*, No. 06-297, 2009 U.S. Dist. LEXIS 32201, at *15 (D. Del. April 16, 2009) (emphasis added)).

The objective evidence clearly shows that Endo did not objectively agree to be bound by the "material and necessary" terms of a settlement. The district court committed legal error by ignoring objective and definitive evidence that a settlement was not reached, and instead finding mutual assent on the basis of inferences and testimony by Mylan's witnesses regarding their subjective beliefs, which were never communicated to Endo. In view of these legal errors, the district court's determination of mutual assent is not entitled to deference.

Remarkably, the trial court held that Donatiello's short initial response of, "That's great," should be viewed as an "intent to be bound ... as to the three terms" – but yet his follow-up statement moments later that there were "*significant issues* to be resolved *before any settlement could be completed*," according to the Opinion, "does not indicate an intent not to be bound by the three terms." (A25.) Donatiello's reference to "*significant* issues," according to the district court, referred only to "non-essential terms" and "other fine points." (A25, 31.) These findings defy logic, and do not pass clear error review. Even more, the parties both acknowledged that, during the January 28 call, they said discussions would continue with respect to the remaining terms proposed by Mylan (A2763) and that Mylan's draft was a "starting point" (A2667) to be marked-up.

45

The district court's decision, if affirmed, will greatly disrupt the conventional and reasonable way in which settlement discussions occur. Future settlement discussions will be thrown into disarray if a party risks having an incomplete agreement judicially enforced against it, despite clearly and explicitly informing the other party that – notwithstanding progress in negotiations – the settlement was not complete, and "*significant issues*" remained. There was no objective agreement here, and so a policy of encouraging future settlements also supports reversal.

### 3. The Parties Failed Even to Agree on a Sufficiently Definite Term for Mylan's Launch Date

One of the primary, threshold issues was Mylan's launch date ███████ ████████████████████████████████████████████. The evidence, however, shows no definite agreement on that term, *i.e.*, what did it mean when the parties discussed "four weeks" prior to the expiration of the '864 patent. The extension found in '864 patent file-wrapper unambiguously provides that the '864 patent expires on November 8, 2015. (A124-25.) The '864 patent initially was set to "expire on" November 7, 2012, but received a Patent Term Extension in partial return of the time for regulatory review, to and including November 8, 2015.

Given the November 8, 2015 expiration of the '864 patent, Endo understood that when it agreed to a term that would permit Mylan to launch "four weeks" prior to expiration, this meant ███████████. (*See* A2153-54 at ¶¶ 12-

13.)  But yet when Endo received the January 24 Mylan Draft, Mylan inserted a launch date of ██████████.  (A3053 at § 8(a)(i); A2694.)  (It is not a typographical error as Donatiello initially assumed:  this same ██████████ date appears in Mylan's briefing (A2078, 2084-85, the Tiglio declaration (A2092 at ¶ 4), and Mylan's proposed order (47A2072 at ¶ 1).  (*See also* A2808-09.)  The discrepancy in dates reflected the parties' failure to reach a definite agreement on this material term.

Mylan has argued that Endo previously agreed to an expiration date of November 7, 2015 in the parties' pretrial stipulated facts, but Mylan is mistaken.  The parties' stipulated fact accurately states that the Patent Term Extension "extends the patent term <u>to</u> November 7, 2015" (A825 (Stipulated Fact ¶ 39)), emphasis added), *i.e.*, that term "expires on" November 8, 2015.  A different phrasing appears for the '611 and '871 47patents, which did not have patent term extensions; there, the parties stated that each one "expires on" a particular date. (A826, 828 (Stipulated Fact ¶¶ 46, 53).)

Moreover, even if Mylan had counted from November 7, Mylan was still incorrect in claiming the ██████████ entry ████.  Even starting from the November 7, 2015, "four weeks" earlier is ██████████ – not ██████████ as Mylan asserted.  (And, as noted, even one day is extremely material.)

During the hearing, Tiglio testified that the date discrepancy was her

"miscalculat[ion]." (A26.)  The district court credited this testimony and thereby

discounted the entire issue.  It even unjustly accused Endo of "manufactur[ing] a

dispute as to the expiration date" based on its finding that Endo "stipulated to an

*expiration date* of November 7, 2015."  (A27 (emphasis added).)  But as discussed

above, Endo did not enter such a stipulation, and starting from November 7 does

not yield the date to which Endo in fact agreed.

Fundamentally, however, this is a red herring – since it is the

objective negotiations that matter.  Irrespective of what the parties "said" in other

contexts, and even irrespective of the alleged trial stipulation and the appropriate

method to reduce "four weeks" to a specific date, this entire discourse

demonstrates that Donatiello and Tiglio *meant* two different things based upon

what was said in these discussions.  At the end of the day, Donatiello believed

Endo agreed to let Mylan launch on ███████████; Tiglio believed Mylan

could launch on ███████████ – this is a material difference not just because the

███████████ (as discussed above, Mylan took 2½ weeks to consider a

three-day authorized generic issue) but also because the difference between

████████████████████████████████████████████████

███████████████████████████. (*See* A2185.)

"There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations" and "neither party knows or has reason to know the meaning attached by the other." Restatement (Second) of Contracts § 20 (1981).  If negotiations had continued, instead of ending mid-discussions, the parties would have realized this material difference in interpretation, and then would have negotiated an exact date, *i.e.,* part of the "mark-up."  But the parties never reached that point, and the district court cannot enforce terms to which the parties never agreed.

The parties' failure to agree on the meaning of this essential term reflects not only that there was not a true meeting of the minds, but also that the term as expressed by the parties (*i.e.,* four weeks prior to '864 patent expiration) was not "sufficiently definite to be enforceable."  *Quandry*, 2009 U.S. Dist. LEXIS 31459, at *25; *Intellisource* 1999 U.S. Dist. LEXIS 12446 at *12-15 (accord). Mylan did not meet its burden, and the trial court erred in finding a definite and enforceable agreement despite material divergences in the parties' interpretation of a key term.

### 4.     The Parties Contemplated that a Complete Writing Was Necessary in Order to Create Final Enforceable Agreement.

"It is a well-established principle of contract law that if either party knows or has reason to know that the other party regards the agreement as

incomplete and intends that no obligation shall exist until other terms are assented

to or until the whole has been reduced to another written form, the preliminary

negotiations and agreements do not constitute a contract." *Intellisource*, 1999 U.S.

Dist. LEXIS 12446 at *15 (quoting Restatement (Second) of Contracts § 27 cmt. b

(1981)).  Further, for complex agreements, "the requirement that the agreement be

in writing and formally executed simply cannot be a surprise to anyone."

*Ciaramella v. Reader's Digest Assn., Inc.*, 131 F.3d 320, 326 (2d Cir. 1997)

(internal citation omitted).

The court below acknowledged that "both parties clearly intended that

a written contract would ultimately be drafted," but found that "the record contains

*no evidence* indicating that the parties made a settlement contingent upon the

execution of a written agreement."  (A28 (emphasis added).)  This finding is

clearly erroneous.

First, the January 24 Mylan Draft is evidence that a writing was

intended, it includes a provision – consistent with Endo's own expectations

(A2763-64, 2782-83) – that the "Agreement shall become binding when any one or

more counterparts hereof, individually or taken together, bears the signatures of

each of the Parties." (A3059 at § 19.)  Tiglio similarly testified that she

"Absolutely" expected that any agreement would be reduced to writing.  (*See*

(A2672.)  Second, even taking the district court's unreasonably narrow finding that

Donatiello referred *only* to the January 24 Mylan Draft in stating that "significant issues to be resolved" before any settlement could be completed (*see* A16, 25), this statement *at minimum* reflects that Donatiello informed Mylan that the settlement would *not be complete* until the parties resolved these "significant issues" with the *written draft*. Moreover, Donatiello testified that Endo always enters into a written agreement when settling generic drug litigation (A2782-83), consistent with obligations to submit generic drug settlements in accordance with the Medicare Modernization Act (*see* footnote 10). And, similarly, during the January 28 phone call Tiglio clearly asked about the written draft and invited Donatiello to express Endo's concerns in writing by marking up the draft. The district court clearly erred in finding "no evidence" in the record indicating that the parties had made any settlement contingent on a written agreement.

### C. The District Court's Ruling Is Untenable Since Complex Negotiations Require Tentative "Agreements Made Along the Way"

"Agreements made along the way to a completed negotiation … must necessarily be treated as provisional and tentative. Negotiation of complex, multi-faceted commercial transactions could hardly proceed in any other way." *Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1102 (Del. Ch. 1986); *id.* at 1102 n.4 ("'Especially when large deals are concluded among corporations and individuals of substance, the usual sequence of events is not that of offer and acceptance.'")

(quoting *Int'l Telemeter Corp. v. Teleprompter Corp.*, 592 F.2d 49, 57 n.1 (2d Cir. 1979) (Friendly, J., concurring)).

Overall, the district court's decision rests on an unrealistic interpretation of an "offer" and "acceptance" in the world of complex commercial negotiations, and in so doing, finds that a party can be bound by incomplete settlement discussions simply because its agent said a phrase like "That's great" a few seconds before cautioning that there were "significant issues to be resolved before any settlement could be completed." This ruling is not only contrary to controlling precedent on contract formation, but further, if allowed to stand it will greatly chill future negotiations.[14]

---

[14] Moreover, after docketing of this appeal, the district court granted Mylan's request to substantially redact the April 8, 2014 opinion (A3469-70) – over Endo's opposition, and contrary to Third Circuit precedent. The district court's redaction of nearly all of the factual background underlying its decision (*see* A3471-509) creates even more confusion and will further stifle settlement negotiations since parties to future negotiations are deprived of the ability to meaningfully assess how to avoid having their preliminary and incomplete negotiations fall subject to the court's expansive holding with respect to settlement enforcement, unless this Court reverses. (*See* A3083-87 (*citing, e.g., Bank of Am. Nat'l Trust & Sav. Ass'n v. Hotel Rittenhouse Assocs.*, 800 F.2d 339, 344-45 (3d Cir. 1986) (when parties "utilize the judicial process to interpret [a] settlement and to enforce it, the parties are no longer entitled to invoke the confidentiality ordinarily accorded settlement agreements," since the "court's approval of a settlement or action on a motion are matters which the public has the right to know about and evaluate."); *Mosaid Techs., Inc. v. LSI Corp.*, 878 F. Supp. 2d 503, 513-14 (D. Del. 2012) ("In order for courts to 'talk' to litigants and for the public to fully understand a court's precedent, how prior decisions were arrived at, and the similarities among cases, courts need to disclose at least some of the terms of the agreements—even confidential ones—that are the subject of the adjudication. Otherwise, our

* * *

Accordingly, it is clear that the district court incorrectly found that the parties had entered into a settlement during the January 28 phone call, and that decision should be reversed with an instruction to reinstate the Merits Decision holding that Mylan infringes the '864 patent.

## II. THE COURT BELOW IMPROPERLY APPLIED JUDICIAL ESTOPPEL IN ORDER TO PRECLUDE ENDO FROM PURSUING CLAIMS AGAINST MYLAN BASED ON THE '611 AND '871 PATENTS.

### A. The Court Misapplied the Doctrine of Judicial Estoppel

The Third Circuit has laid out three prongs that **must** be present for a court to properly invoke judicial estoppel:

> "(1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or her position in bad faith, i.e., in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity."

*Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 777-78 (3d Cir. 2001). If any prong is not met, judicial estoppel is inappropriate and must be reversed. *Id.* at 778; *see also Ryan Operations G.P. v. Santiam-Midwest Lumber*

---

opinions and transcripts would become useless and devoid of context, such that even the basic nature of disputes would be indiscernible.").)) Mylan never responded to the Third Circuit precedent – and neither did the court, which declined to provide any analysis for its decision other than reference to "substantially the same reasons set forth by Defendants" (A3469).

*Co.*, 81 F.3d 355, 361-62 (3d Cir. 1996) ("[A]ny application of the doctrine *must rest* upon a finding that the party against whom estoppel is sought asserted a position inconsistent with one she previously asserted in a judicial proceeding.")(emphasis added); *see also id.* (noting that the doctrine of judicial estoppel does not apply "when the prior position was taken because of a good faith mistake rather than as part of a scheme to mislead the court") (citation omitted).

Here, the district court did ***not*** find that Endo adopted an inconsistent position, did ***not*** find that Endo acted in bad faith, and did ***not*** find that estoppel was the sole means by which the court could protect the integrity of the judicial proceedings. Without those findings, the court's invocation of this doctrine is an abuse of discretion. *See Montrose Med. Grp.*, 243 F.3d at 780 (a court "abuses its discretion when its ruling is founded on an error of law")(internal quotation marks omitted). In the absence of ***any*** of those findings, application of the doctrine is entirely unthinkable. Nothing in this case would permit a reasonable fact finder to infer any inconsistent positions in a prior proceeding or that Endo acted in bad faith let alone an attack on the court's integrity.

Although *Mylan* objected to Endo's filing a terminal disclaimer before trial, this objection is both unwarranted and irrelevant. It is unwarranted because it is long-settled that a terminal disclaimer can be filed at *any* time, *even* after a trial decision on obviousness type double patenting. *See Perricone v. Medicis Pharm.*

54

*Corp.*, 432 F.3d 1368, 1375 (Fed. Cir. 2005). And it is irrelevant here because "[j]udicial estoppel's sole valid use ... is to remedy an affront to the *court's* integrity*," not to alleviate any perceived prejudice to another party. *United States v. Pelullo*, 399 F.3d 197, 223 (3d Cir. 2005) (quoting *Montrose Med. Grp*., 243 F.3d at 778)(emphasis added). (Presumably, the district court could have continued the trial as to the '611 and '871 patents, instead of stopping Endo from presenting its infringement evidence, and could have tried the double patenting defense if it questioned the effect of the terminal disclaimer.)

The district court failed to make the required findings necessary to invoke judicial estoppel – a "sanction [for] malfeasance." *Montrose Med. Grp*., 243 F.3d at 779. Instead, it explained its decision to judicially estop Endo from asserting its rights in the '611 and '871 patents solely by reference to the procedural posture of the case. (A1710 ("I think at the end of the day, given the posture of this case, that this court will judicially estop Endo from further prosecuting Mylan on the '611 and the '871 patent in the current ANDA.")). When "properly invoked," this sanction protects the integrity of the court. *Montrose Med. Grp*., 243 F.3d at 779. However, where – as here – it is improperly invoked, its usage must be reversed, and Endo's claims against Mylan on the '611 and '871 patents should be restored.

### B.     The District Court's Finding that Endo "Abandoned" Its Rights In the '611 and '871 patents is Clearly Erroneous

As discussed *supra*, the district court improperly invoked the doctrine of judicial estoppel.  The district court's decision from the bench also appeared to make a factual finding that Endo abandoned its rights in the '611 and '871 patents.[15]  This finding is clearly erroneous, thereby providing a second and independent basis for reversal of the court's judicial estoppel holding.

"Abandonment" of property is a technical legal concept requiring evidence of a specific intent to relinquish a known right.  1 Am. Jur. 2d. *Abandoned, Lost, and Unclaimed Property*, § 58 (2005) (hereinafter 1 Am. Jur. 2d.).  Abandonment of property is defined as "the relinquishing of all title, possession or claim to or of it – a virtual throwing away of it.  It is not presumed.  Proof supporting it must be direct or affirmative or reasonably beget the exclusive

---

[15] This finding is reflected also in the vacated Merits Decision, where the district court incorrectly said that Endo "no longer wished to proceed with its claims against Mylan as to these two patents," January 28, 2014 Decision and Order at 22, and that Endo "treated the terminal disclaimer, in essence, as a withdrawal of Endo's Claims." *Id*.  "As a result [of this abandonment], [the] Court ruled that Endo would be estopped from resurrecting those claims at a later date in this litigation." *Id*. at 19-20.  The court further held that it based its estoppel decision "not on the terminal disclaimer, but on the unequivocal statements of counsel signifying Endo's intent to abandon its claims here." *Id*. at 21.  Specifically, the court found that counsel's statements "repeatedly confirmed its intention to abandon the claims related to the '871 and '611 Patents," *id*. at 23.  On the basis of this finding of abandonment, the court found that judicial estoppel was warranted. *Id*. at 26.  Since, however, the opinion was vacated, this need not be addressed in this appeal but is included for completeness.

inference of throwing away." *United States v. Abbott*, 584 F. Supp. 442, 451 (W.D. Pa. 1984) (quoting *United States v. Cowan*, 396 F.2d 83, 87 (2d Cir. 1968)); *see also* 1 Am. Jur. 2d., § 3. Since patent rights are property, *see Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 730 (2002), any judicial decision that extinguishes patent rights must be supported by unequivocal evidence of both abandonment and the intent to abandon. 1 Am. Jur. 2d, §§ 3, 9. Abandonment may be declared as a matter of law only where "all the essential factors are admitted or indisputably proved and the inferences to be drawn from them are certain and free from doubt." *Id.* § 55. Therefore, to find abandonment as a matter of law, the actual intent of the party to "leave, quit, renounce, resign, surrender, relinquish, vacate, or discard" the property (*id.* § 3) must be supported by "clear and unequivocal evidence." *United States v. Moody*, 485 F.2d 531, 534 (3d Cir. 1973) (citations omitted); 1 Am. Jur. 2d, § 9 ("The intent to abandon is considered the first and paramount inquiry and actual intent to abandon must be shown."). Here, the court's finding of abandonment is not supported by any evidence, much less evidence that is free from any uncertainty or doubt.

As a threshold matter, the Federal Rules of Civil Procedure identify the manner in which parties can indicate their intent to abandon a claim: voluntary dismissal pursuant to Fed. R. Civ. P. 41(a). Here, Endo did not seek a dismissal of its claims. As further evidence of Endo's intent to pursue – not abandon – its

property rights, Endo took steps to ensure the viability of the '611 and '871 Patents before trial.  Specifically, Endo filed a terminal disclaimer with the U.S.P.T.O., which had the effect of mooting out Mylan's only unique defense on these patents. Rather than evince an intention to abandon its rights in these patents, this showcases Endo's intent to ensure that its rights in the '611 and '871 patents would endure.  Moreover, when at trial the district court said "the '611 and the '871 are not in the case because I'm assuming the effectiveness of the terminal disclaimer, and so I don't think you can say that they're in the case," Endo responded clearly that a terminal disclaimer "doesn't terminate the patents, it doesn't terminate an infringement claim." (A1709.)  In other words, Endo never abandoned or expressed its desire to abandon any right.

Set against this backdrop, the district court's factual finding that Endo intended to abandon its claim to these patents is entirely unsupported by objective evidence.  There is no basis for the court to infer a withdrawal or abandonment of claims where, as here, the Federal Rules of Civil Procedure outline the clear process to remove a particular patent claim from the case or controversy.  Indeed, absent evidence of a "fail[ure] to prosecute," Fed. R. Civ. P. 41(b) – courts lack authority to compel a party to withdraw a claim.  It follows that a court simply lacks authority to accomplish this same result through a judicial finding of "abandonment," where that finding is thoroughly unsupported by objective

evidence.  At no point did Endo offer to withdraw or dismiss these claims; in fact,

Endo explicitly disclaimed any such intention by filing a terminal disclaimer.

Throughout the November 13 colloquy, Endo consistently set forth its

position that a trial on the '864 patent would subsume the outcome of the validity

challenge to the '611 and '871 patents in light of the terminal disclaimers and even

offered to stipulate to that position.  The district court appears to have

*misunderstood* Endo's offered stipulation as an abandonment of its claims over the

'611 and '871 patents even after Endo suggested there was a misunderstanding.

(*E.g.*, A1709.)  It further appears that the court concluded that the terminal

disclaimer was proof of Endo's intent to *abandon* its infringement claims against

Mylan on the '611 and '871 patents.  (*See, e.g.*, A1686 ("Mylan is not threatened

by those patents as a result of the filing of the disclaimer."); *id*. ("[A]s a result of

the disclaimer you no longer have any threat of prosecution."); A1698-99.)

Extinguishing Endo's property rights is an egregious abuse of judicial discretion.

Because the district court's finding of abandonment is clearly erroneous, this Order

should be reversed and the case remanded for decision on Mylan's infringement of

the '611 and '871 patents.

## CONCLUSION

For the reasons stated above, the district court's April 8 Opinion and

judgment granting Mylan's motion to enforce a settlement agreement and

affording other related relief, as well as its judicial estoppel and abandonment ruling with respect to the '611 and '871 patents, should be reversed.


June 20, 2014                          Respectfully submitted,


                                      /s/ Jeffrey I.D. Lewis

                                      Jeffrey I.D. Lewis (Counsel of Record)
                                      Jason R Vitullo
                                      Helen P. O'Reilly
                                      PATTERSON BELKNAP WEBB & TYLER LLP
                                      1133 Avenue of the Americas
                                      New York, New York 10036
                                      212-336-2000
                                      Fax 212-336-2111
                                      jidlewis@pbwt.com

CASE PARTICIPANTS ONLY Document: 115 Filed: 06/20/2014

# ADDENDUM

# **ADDENDUM**

# **TABLE OF CONTENTS**

| | |
|---|---|
| Sealed Opinion regarding settlement, dated April 8, 2014 (Filed Under Seal) (Dkt. 308) | A1-39 |
| Sealed Order regarding settlement, dated April 8, 2014 (Filed Under Seal) (Dkt. 309) | A40-41 |
| Pages 207-216 from Official Transcript of Bench Trial held on Nov. 12, 2013 (Day 1) before Judge Bumb (Dkt. 213) | A1638-47 |
| Pages 249-279 from Official Transcript of Bench Trial held on Nov. 13, 2013 (Day 2) before Judge Bumb (Dkt. 214) | A1680-1710 |

PAGES A-1 TO A-39
REMOVED DUE TO CONFIDENTIAL MATERIAL

PAGES A-40 TO A-41
REMOVED DUE TO CONFIDENTIAL MATERIAL

PAGES A-1638 TO A-1647
REMOVED DUE TO CONFIDENTIAL MATERIAL

PAGES A-1680 TO A-1710
REMOVED DUE TO CONFIDENTIAL MATERIAL

# United States Court of Appeals
## for the Federal Circuit

### CERTIFICATE OF SERVICE

2014-1422 Endo Pharmaceuticals Inc. v. Mylan Pharmaceuticals Inc.
and Mylan Inc.

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by PATTERSON BELKNAP WEBB &TYLER LLP, Attorney for Plaintiff-Appellant to print this document. I am an employee of Counsel Press.

On **June 20, 2014**, Counsel for Appellant has authorized me to electronically file the foregoing **Appellant Endo Pharmaceutical Inc.'s Opening Brief (Confidential and Non-Confidential)** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Douglas H. Carsten
Wilson, Sonsini, Goodrich & Rosati, PC
12235 El Camino Real
Suite 200
San Diego, CA 92130
dcarsten@wsgr.com
858-350-2300
Attorneys for Defendant-Appellee

In addition, two copies of the Confidential Brief will be sent via express mail on the same date as above.

Upon acceptance by the Court of the e-filed document, six paper copies will

filed with the Court, via Federal Express, within the time provided in the Court's

rules.

/s/ Robyn Cocho
Counsel Press

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(A)</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).  The brief contains 13,994 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b), as calculated by Microsoft Word 2010, the word count of the word processing system used in preparing it.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010, Times New Roman, 14 point font.

Dated:  June 20, 2014

/s/ Jeffrey I.D. Lewis

Jeffrey I.D. Lewis (Counsel of Record)
Jason R Vitullo
Helen P. O'Reilly
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
212-336-2000
Fax 212-336-2111
jidlewis@pbwt.com

*Counsel for Plaintiff-Appellant*
*Endo Pharmaceuticals Inc.*
